UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ESTATE OF JIMMIE MARTELL SANDERS,

        Plaintiff,

        v.                              Case No. 20-cv-1164-pp

JAY STEINKE,

        Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 26) AND DISMISSING CASE

The facts that gave rise to this lawsuit are heartbreaking. Jimmie Martell Sanders tried to do a good deed; in the wee hours of the morning at a bar in Appleton, he tried to break up a fight between two bar patrons, one of whom had decided to resolve the dispute by pulling out and firing a gun. The defendant—a law enforcement officer who happened to be on foot patrol in the area—responded to the scene and ended up firing shots into the bar, at someone whom he perceived had a gun. One of those shots found Mr. Sanders and killed him. The bar patron who pulled the gun has been convicted of criminal offenses, as has a person who assisted him by spiriting his gun out of the bar. But Mr. Sanders's estate, through its special administrator (Mr. Sanders's mother), has sued the defendant law enforcement officer for violating Mr. Sanders's Fourth Amendment right to be free from excessive force.

1

On July 28, 2020, the plaintiff sued the defendant under 42 U.S.C. §1983. Dkt. No. 1. The complaint alleges that the defendant violated Mr. Sanders's Fourth Amendment rights by using unreasonable force that resulted in Sander's death. Id. at ¶22. On October 22, 2021, the defendant filed a motion for summary judgment. Dkt. No. 26.

Because the plaintiff has not met its burden to defeat the affirmative defense of qualified immunity, the court will grant the defendant's motion for summary judgment. Id. The court cannot imagine the grief that Mr. Sanders's family has suffered. It simply cannot find that the defendant violated clearly established law when he fired the shot that took Mr. Sanders's life.

## I.    Summary Judgment Standard

A defendant is entitled to summary judgment if he "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) ("By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (emphasis in original)). "Material facts" are those that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id.

Summary judgment is proper "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in [their] favor." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Makowski v. SmithAmundsen LLC, 662 F.3d 818, 822 (7th Cir. 2011)). Summary judgment is the proverbial "put up or shut up" moment in a lawsuit "when a party must show what evidence it has that would convince a trier of fact to accept its version of events." Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003).

"To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Anderson, 477 U.S. at 255). "However, favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald, 707 F.3d at 730 (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). "A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact" and "a mere disagreement with the movant's asserted facts is inadequate if made without

reference to specific supporting material." Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) (internal quotations and citations omitted).

At summary judgment, the court may "not weigh credibility, balance the relative weight of conflicting evidence, choose between competing inferences, or resolve swearing contests." Flowers v. Renfro, 46 F.4th 631, 636 (7th Cir. 2022); see also Berry v. Chi. Transit Auth., 618 F.3d 688, 691 (7th Cir. 2010) ("It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders.").

## II. Facts

### A. Beginning of Fight at Jack's Apple Pub

In the early morning hours of May 21, 2017, Mr. Sanders was at Jack's Apple Pub (the Pub) in Appleton, Wisconsin. Dkt. No. 32-1 at 4, Tr. p. 10, lines 17-19; Tr. p. 12, lines 14-18. While Mr. Sanders was at the Pub, two other patrons of the bar—Henry Nellum and Leander Moffitt—began arguing; the argument escalated into a fistfight. Id. at 6, Tr. p. 20, lines 4-25, Tr. p. 21, lines 1-7; Id. at 17, Tr. p. 64, lines 15-21; Dkt. No. 39-2 at 21:44. Nellum and Moffitt both ended up on the ground, at which point Nellum got on top of Moffitt. Dkt. No. 32-1 at 7, Tr. p. 23, lines 15-23; Tr. p. 64, lines 15-24.

Mr. Sanders and another patron intervened in the fight by pulling Nellum off Moffitt. Dkt. No. 32-1 at 13, Tr. p. 47, lines 4-7; Dkt. No. 32-2 at 7, Tr. p. 19, lines 13-25; Dkt. No. 39-2 at 22:00. Nellum pulled out a gun. Dkt. No. 32-1 at 6, Tr. p. 20, lines 4-25, Tr. p. 21, lines 1-7; Dkt. No. 39-2 at 22:05. Many of the bar's other patrons fled the Pub into the surrounding streets. Dkt. No. 32-1

4

at 11, Tr. p. 38, lines 9-16; Dkt. No. 29-1, Tr. p. 83, lines 2-12. Meanwhile, the scuffle continued with various participants grabbing for Nellum's gun. Dkt. No. 32-1 at 9, Tr. p. 31, lines 2-15; Dkt. No. 32-2 at 10, Tr. p. 32, lines 11-25, Tr. p. 33, lines 1-5. As the court will discuss below, the parties dispute what occurred during this scuffle and who came away from the scuffle holding Nellum's gun.

B.    The Defendant's Arrival at the Pub

Around the time of the fight, the defendant and Officer Aguilar were on duty and patrolling the area near the Pub. Dkt. No. 29-1 at 19-20, Tr. p. 73, lines 9-25, Tr. p. 74, lines 1-18. They were monitoring activity in that area because it is perceived as an area with high levels of criminal activity and an area that sometimes is dangerous. Dkt. No. 29-1 at 19-20, Tr. p. 73, lines 9-25, Tr. p. 74, lines 1-18. Hoping to prevent criminal activity, Appleton police officers monitor the area while initiating contact and engaging people in conversation. Dkt. No. 29-1 at 19-20, Tr. p. 73, lines 9-25, Tr. p. 74, lines 1-18.

The defendant provided a scaled diagram of the Pub. Dkt. No. 29-4. The Pub is located on the corner of College Avenue and State Street. See Dkt. No. 29-2. It is long and narrow; the narrow side of the Pub—the north side—faces College Avenue and contains an entry/exit door. The wide side of the Pub—the west side—faces State Street; it, too, contains an entry/exit door. Id.; Dkt. No. 29-4. The U-shaped bar is at the north end of the Pub, on the east wall. At the back of the bar are tables, a pool table and the restrooms. Dkt. No. 29-4.

At the time of the fight, the defendant and Officer Aguilar were standing outside the north exit of the Pub, on College Avenue. Dkt. No. 29-1 at 22, Tr. p. 83, lines 2-4; Dkt. No. 29-2 at 3. The defendant began observing people leaving the Pub in a highly emotional, chaotic, scared retreat, apparently to get away from something inside the Pub. Dkt. No. 29-1 at 22, Tr. p. 83, lines 5-12. The defendant heard people leaving the Pub say, "They are shooting inside," or "He's shooting inside." Dkt. No. 29-1 at 24, Tr. p. 91, lines 6-23. The defendant did not personally hear the gunshots reported by those fleeing. Dkt. No. 29-1 at 24, Tr. p. 99, lines 2-22.

The defendant radioed "shots fired" to other law enforcement, then moved toward the west exit of the Pub, the one on State Street. Dkt. No. 29-1 at 24, Tr. p. 92, lines 2-3; 45, Tr. p. 175, lines 4-13. The defendant believed there would be a potential tactical advantage to moving to the west door of the Pub, which is used as an exit, because he could see more of the interior of the Pub without having to fully enter the building. Dkt. No. 29-1 at 24, Tr. p. 92, lines 8-25, Tr. p. 93, lines 1-24. When the defendant approached, the west door of the Pub was propped open, with the door swinging inward toward the south. Dkt. No. 29-1 at 31, Tr. p. 119, lines 16-18; Dkt. No. 29-3 at 16:01. When the defendant reached the west side of the building, he observed more fearful people who stated there still was somebody shooting inside the Pub. Dkt. No. 29-1 at 33, Tr. p. 120, lines 9-14. The defendant noticed people immediately in and near the Pub's west doorway who did not have weapons, although they were responding or reacting to something. Dkt. No. 29-1 at 32,

Tr. p. 124, lines 22-25, Tr. p. 125, lines 1-25; 33, Tr. p. 126, lines 1-2. Based on the defendant's observations, he believed there was an active shooter inside the Pub who posed an immediate threat to others. Dkt. No. 29-1 at 25, Tr. p. 97, lines 14-25; 26, Tr. p. 98, lines 1-23.

The defendant positioned himself against the outside wall of the Pub, just north of the west doorway. Dkt. No. 29-1 at 31, Tr. p. 122, lines 1-21. From this position, the defendant quickly visually scanned the interior of the Pub, starting from the south side toward the middle. Id. The defendant did not observe an immediate threat in the south side of the Pub. Dkt. No. 29-1 at 31, Tr. p. 120, lines 20-25, Tr. p. 121, lines 1-21. The defendant then entered the interior of the Pub, while pivoting his body northward, so that he could see the north side of the Pub. Dkt. No. 29-1 at 32, Tr. p. 124, lines 18-25, Tr. p. 125, lines 1-4. The parties agree that the defendant then fired several shots toward the north end of the Pub, one of which struck Mr. Sanders in the back. Dkt. No. 29-1 at 33, Tr. p. 129, lines 11-22; 36, Tr. p. 141, lines 13-25.

But as detailed below, the parties dispute what the defendant saw as he turned toward the north side of the Pub and, when he fired, who he intended to shoot.

C.    Dispute Regarding Moments Immediately Surrounding Shooting

In his summary judgment motion, the defendant argued that the plaintiff cannot prove a Fourth Amendment violation because there was no "seizure" of Mr. Sanders. Specifically, he asserted that there was "no dispute" that Mr. Sanders was not the target of the shots the defendant fired at the Pub. Dkt. No.

7

17 at 7. He also argued that even if he had "seized" Mr. Sanders, the force he used (firing shots) was not objectively unreasonable, because he had reason to believe a crime was taking place inside the Pub; when he looked in the Pub, he saw Nellum with a gun; and the episode was short in duration and high in stress and danger. Id. at 9.

In support of these arguments, the defendant filed exhibits, including two videos. The first video—Dkt. No. 29-3—is a video from a surveillance camera mounted inside the Pub; it appears to be mounted on the ceiling over the north end of the U-shaped bar, facing the south end of the Pub. From its vantage point, one can see part of the west side of the bar, the south side of the bar, the west door out onto State Street (on the right side of the video, swung upon into the Pub and propped open), the pool table and the tables in the back/south end of the Publ. Id. The lens of the camera has something— fingerprints or moisture or dirt—on it; portions of the screen are blurred, making it difficult to see what is recorded. The video begins at 1:30:08 a.m. and runs for 20 minutes and 51 seconds, until 1:50:58 a.m. Id.

The second video is footage recorded by the body camera worn by Lt. Carlos del Plaine, who arrived on the scene after the shooting, and after the defendant had left the Pub and taken up a position outside, behind a parked squad car. Dkt. No. 29-7. The body camera footage lasts for 24 minutes and 41

seconds. There are significant portions of the video where the camera is blocked, so one cannot see what del Plaine was seeing.[1]

In its opposition brief, the plaintiff recounted a different set of facts than those recounted by the defendant. The plaintiff stated in its opposition brief that during the scuffle over the gun, "Mr. Sanders picked up the gun." Dkt. No. 36 at 2. The plaintiff asserted that when Lt. del Plaine appeared on the scene shortly after the shooting, the defendant "described the person he shot as wearing all black." Id. at 2. The plaintiff stated that "Mr. Sanders was the only person in the bar at that time wearing all black." Id. The plaintiff disputed that Nellum was pointing a gun at the defendant when the defendant fired, and that Nellum was moving toward the defendant when the defendant fired; the plaintiff argued that the defendant's "description of the person he intended to shoot at matches only Mr. Sanders." Id. at 5.

In his reply brief, the defendant expressed astonishment at the plaintiff's description of the events—that "Mr. Nellum was shot in the arm by his own gun, which Mr. Sanders had in his hand when [the defendant] entered the [Pub]." Dkt. No. 38 at 1. The defendant asserted that after being shot by the defendant, Nellum had fallen to the ground, then had handed his gun to his girlfriend (Dree Sullivan), who subsequently pled guilty to taking the gun and hiding it from police. Id. The defendant emphasized that in support of its version of events, the plaintiff had cited only the deposition testimony of Donna

---

[1] The defendant also provided some transcripts and CCAP reports; the parties do not seem to dispute most of that evidence.

Skogeboe (a patron of the Pub who was present during the incident), which the defendant asserted "dealt exclusively with Ms. Skogeboe's testimony regarding her review of the video of the incident." Id. at 3. The defendant identified the portion of the video that he said had been shown to Skoegeboe, asserting that it was video of events that occurred after the defendant had fired. Id. The defendant went on to argue:

> Plaintiff has proffered facts that no reasonable jury could believe, and the Court should reject Plaintiff's facts where it refutes the video evidence. Courts are instructed that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, it should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 . . . (2007); *Rowe v. DeRosa*, no. 15-C-1006, 2018 WL 502658, at *7 (E.D. Wis. Jan. 22, 2018). Furthermore, courts in this Circuit have ruled that "[t]he Court may consider video evidence, and in situations where the video evidence refutes the plaintiff's account of the facts, 'the court should not accept plaintiff's story for purposes of summary judgment.'" *Jackson v. City of Bloomington*, No. 17-CV-1046-JES-JEH, 2019 WL 570729, at *6 (C.D. Ill. Feb. 12, 2019); *Gillis v. Pollard*, 554 F. App'x 502, 506 (7th Cir. 2014) (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Indeed, *Scott v. Harris* ruled that the summary judgment standard adjusts when there is video evidence and that courts should "view facts in the light depicted by the videotape." *Scott* at 378-81.

> Here, the Court should not accept Plaintiff's distorted facts, which refutes the video evidence. For instance, Plaintiff has proffered facts that Mr. Nellum was inexplicably shot in the arm by his own gun; that Mr. Sanders had the gun in his hand when [the defendant] entered the bar; and that Mr. Nellum was not advancing on [the defendant] when [the defendant] shot at Mr. Nellum. (Dkt. 34, ¶¶6-8, 17) No reasonable jury could believe Plaintiff's proffered facts.

> In Molly Pickart's[2] cell phone footage, it clearly shows Mr. Nellum running towards [the defendant] as [the defendant] enters the bar doorway. (*See* Def's Resp. to Pltf's PFOF ¶ 17) [The defendant]

___

[2] This is the first mention in any briefing of anyone named "Molly Pickart."

then fired four gunshots at Mr. Nellum as he advanced on him, and Mr. Nellum fell to the ground near the State Street doorway after being shot. (Dkt. No. 28, ¶¶ 35-36, 38, 41) In the bar camera footage, at 1:46:33 a.m., Ms. Sullivan then walks to Mr. Nellum who reaches out and hands his gun to Ms. Sullivan. (Dkt. No. 35, ¶ 63) Ms. Sullivan then exited the bar and hid Mr. Nellum's gun from the police. (Dkt. No. 35, ¶¶ 73, 96) Ms. Sullivan later pled guilty to taking the handgun from Mr. Nellum and fleeing the scene. (*Id.*) The video evidence shows that Mr. Nellum still possessed the gun after being shot by [the defendant] and Ms. Sullivan has pled guilty to taking the gun from Mr. Nellum. As such, Plaintiff's factual assertions should not be accepted by the Court.

Id. at 4-5.

The video footage to which the defendant referred in his reply brief was *not* the video footage he had attached to his motion for summary judgment. Along with his reply brief, the defendant provided the court with two *different* video clips. The first video provided with the reply brief is from a phone held by a bar patron—presumably, the "Molly Pickart" referenced in the defendant's reply brief. Exhibit A to Dkt. No. 37.

The second clip is from *another* surveillance camera inside the Pub. This second camera appears to have been mounted on the ceiling, just inside the College Avenue/north side entrance to the Pub. It is trained on the area immediately between the College Avenue entrance/exit door and the part of the U-shaped bar that faces the College Avenue side of the Pub. This video starts at about 1:23:40 a.m. and runs for 27:03 minutes—that is, until about 1:50:42 a.m. Exhibit B to the defendant's reply brief.

In Scott v. Harris—the 2007 Supreme Court case the defendant cited in his reply brief—the Court addressed a circumstance in which a videotape "quite clearly contradict[ed] the version of the story told by respondent and

11

adopted by the Court of Appeals." Scott, 550 U.S. at 378. Emphasizing that at the summary judgment stage, a court must view the facts in the light most favorable to the nonmoving party "only if there is a 'genuine' dispute as to those facts," the Court said, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonably jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id. at 380. The Seventh Circuit has followed the dictate of Scott in more than one case. In Gillis v. Pollard, the appellate court reiterated that "where video evidence contradicts the plaintiff's version of events, the court should not accept the plaintiff's story for purposes of summary judgment." Gillis, 554 F. App'x at 506. See also, Dockery v. Blackburn, 911 F.3d 458, 466 (7th Cir. 2018) (reversing a denial of qualified immunity because even though the parties disputed the facts, video demonstrated that there was no genuine dispute of material fact); United States v. Norville, 43 F.4th 680, 682 (7th Cir. 2022) ("a video record of the events at issue can evaporate any factual dispute that would otherwise exist.").

But the Seventh Circuit also has explained:

"*Scott* does not hold that courts should reject a plaintiff's account on summary judgment whenever documentary evidence, such as a video, offers *some* support for a governmental officer's version of events." *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 276 (4th Cir. 2011). Instead, *Scott* holds that "where the trial court's determination that a fact is subject to reasonable dispute is blatantly and demonstrably false, a court of appeals may say so, even on interlocutory review." *Blaylock* [*v. City of Philadelphia*], 504 [F.3d 405] at 414 [(3d Cir. 2007)] (dismissing appeal in relevant part where video did not blatantly and demonstrably contradict plaintiff's version); accord, *Witt*, 633 F.3d at 276-77 (same). While the video in

12

> *Dockery* demonstrated facts reaching this outer limit, it should be considered a rare case. It does not apply where the video record is subject to reasonable dispute.

Gant v. Hartman, 924 F.3d 445, 450 (7th Cir. 2019). "Video evidence . . . can eviscerate a factual dispute only when the video is so definitive that there could be no reasonable disagreement about what the video depicts." Kailin v. Vill. of Gurnee, 77 F. 4th 476, 481 (7th Cir. 2023). The Seventh Circuit has said, "It should be considered a rare case where video evidence leaves no room for interpretation by a fact finder." Id. (citing Gant, 924 F.3d at 450).

This is not that rare case. The defendant's reply brief does not make clear to which videos he is referring when he argues that the videos completely refute the plaintiff's version of events. The court has considered all four video clips and cannot conclude that the video evidence is so definitive that there can be no reasonable disagreement about what it shows.

Frustratingly, most of the incident between Nellum and Moffitt takes place outside the view of either of the two Pub surveillance cameras. The video the defendant submitted with his reply brief—Exhibit B—captures part of the altercation. Again, this is the camera at the front (north) end of the Pub, pointed at the area between the College Avenue entrance and the north portion of the bar (there is no audio). Starting around 1:45:21, a woman and two men come into camera range. One of the two men is wearing a black shirt and the other is wearing a jacket and a light-colored shirt. The two are fighting; the man in the jacket throws a punch at the man in the black shirt. The woman appears to be trying to break up the fight. At some point, a third man with a

13

beard, who was wearing a down vest comes from behind the man in the black shirt and wraps his arms around him to subdue the man in the black shirt. But at some point, the third man lets go and the scuffle moves to the right, out of camera range. At around the 1:46 mark, a man leaves the Pub through the College Avenue door. At about the 1:49 mark, two women leave through the College Avenue door. At 1:50:11, a shirtless man appears in the lower, right-hand part of the screen. He has some kind of white fabric around his upper, left arm. He is wearing dark pants sagging down below his underwear, which have a white waistband. His hands are up. He backs to the College Avenue door and backs out of the Pub. Based on the totality of the evidence, this was Nellum, who'd been shot in his left arm and who was surrendering to police.

The video from the second surveillance camera—Dkt. No. 29-3, submitted by the defendant with his summary judgment motion—is angled toward the State Street door on the west side. This is the camera with the smears on the lens. Most of the footage captured by this camera is uneventful. At the 1:45:34 mark, the bartender looks toward the northwest part of the Pub, then multiple patrons begin heading in that direction. But at 1:45:52, a large group of people begins moving very quickly from the northwest part of the Pub toward the State Street door (which is propped open). A few people, including a woman in a white shirt and a woman in a plaid shirt, remain near the State Street door. Then another group of people, including the woman in white, try to exit the State Street door. At 1:46:29, one can see a figure—the defendant—in the State Street door facing into the bar as these people are trying to leave.

14

Four flashes (presumably the defendant's gunshots) can be seen. Then the defendant is pushed out of the State Street door by the group of people, including the woman in the white shirt. A woman wearing grey pants, a white shirt and a dark jacket walks into camera range. She bends over and interacts with someone on the floor behind the bar stools. After bending over this person a couple of times, she comes up with a gun in her hand, then leaves through the State Street door. Seconds later, a person in a dark shirt gets up from the floor behind the bar stools and heads toward the State Street door. He stops, puts his hands up, then sinks to his knees with hands up. The woman in the plaid shirt goes over to the State Street door and tries to close it. After a struggle, she gets it mostly closed. She then assists someone on the floor. The person on the floor—a man—is wearing a black shirt; she helps him remove the shirt. There is a white shirt underneath. The man pulls the white shirt over his head, but leaves it hanging or wrapped around his left arm. The man on the floor eventually gets up and heads to the front of the Pub.

This camera appears to have captured the defendant coming to the State Street door and firing, then being pushed back out. It appears to have captured Dree Sullivan—Nellum's girlfriend—interacting with him and taking his gun out of the Pub. It appears to have captured Skogeboe—the woman in the plaid shirt—trying to close the State Street door and helping Nellum take off his black shirt. And it appears to show Nellum pulling his white shirt over his head, leaving it wrapped around his injured left arm and heading toward the College Avenue door of the bar. But viewing the video, the undersigned could

not identify Mr. Sanders. It could not determine who was standing where when the defendant fired. Although it appears that after the defendant was pushed out of the bar by fleeing patrons, Nellum was on the floor and handed his gun to Sullivan, the video does not show what happened between the time Nellum pulled out the gun and the time he handed it to Sullivan. It does not show the portion of the scuffle during which the gun fell to the floor and does not show who may have picked it up.

The Pub patron who made a video with her camera—Molly Pickart—made it at the time the defendant fired shots. Exhibit A to the reply brief. The video is only ten seconds long; unlike the Pub surveillance cameras, there also is audio. Pickart appears to have been standing at the south end of the Pub, just south of and across from the propped-open exit door leading out to State Street. One hears shots, then the camera jerks to the right, toward the north end of the Pub. One can see a male figure in what appears to be a black, long-sleeved top running from the north end of the Pub toward the State Street door (the door in which the defendant was standing when he fired). One hears multiple shots as the figure is running toward the door. As the shots are fired, the person holding the camera jerks it toward the bar. At that point, the camera no longer is trained on the runner and the footage is blurry and unclear. At about the six-second mark, the camera turns toward the State Street door, but at that point, the footage is dark and indistinct.

This brief video appears to confirm that someone in a black shirt was running toward the door in which the defendant was standing at the time the

16

defendant fired. It seems likely that the runner was Nellum. The other videos show that he was wearing a black shirt and that the fight between him and Moffitt took place mostly in the blind spot between the two Pub surveillance cameras, to the right of the State Street door but to the left of the camera trained on the space in front of the College Avenue door. That is the direction from which Pickart's video shows the dark-shirted runner coming.

Finally, there is del Plaine's body camera footage. Dkt. No. 29-7. When del Plaine arrived, the defendant was across State Street from the Pub. He was standing behind a squad car, legs spread, with his arms braced on the hood of the car. He gripped his gun in both hands and was pointing the gun toward the State Street door of the bar, which was slightly ajar. When del Plaine asks the defendant "who shot?" the defendant responds, "I shot." del Plaine tells the defendant to take a break. The defendant responds, "He's right there, though." del Plaine says, "I see that." The defendant says that "he" is "all in black." As the defendant goes to get into a different squad, del Plaine asks, "Is he down?" The defendant responds, "Yeah. I know he's hit. He's all in black. Black pants, black shirt." del Plaine then walks to the front of the Pub—the College Avenue side—where Nellum is standing with other officers, shirtless. The remainder of the body camera footage shows del Plaine putting Moffitt in a squad car, then going into the Pub and, eventually, joining the officers surrounding Mr. Sanders. Mr. Sanders is on the floor, vomiting and moaning. He is wearing a black, short-sleeved shirt with a graphic on the front.

This video shows that the defendant knew his shots had hit someone, and that that someone was visible to the defendant and del Plaine from their position across the street from the State Street door. It also shows that the defendant believed that he had shot someone wearing all black. But it does not resolve the question of who was holding the gun when the defendant fired, or whether that person was pointing a gun at the defendant. The question it *does* resolve—contrary to the plaintiff's assertion—is whether there was anyone in the Pub that night wearing all black. Nellum was. Mr. Sanders may also have been wearing all black; del Plaine's body camera footage shows that Mr. Sanders was wearing a black shirt and although the vantage point does not show much of Mr. Sanders's pants, they appear to have been dark or black. But Mr. Sanders was *not* the only person in the Pub that night wearing "all black." He was *not* the only person who fit the description the defendant gave del Plaine of the person he'd shot.

Because the cumulative video evidence does not definitively resolve the questions of where Mr. Sanders was standing when the defendant fired, whether Mr. Sanders was holding the gun and whether Nellum was running toward the defendant when the defendant fired, the court will recount each party's version of the facts.

1. *The Defendant's Version*

The defendant's version of events relies on his own deposition testimony, Skogeboe's deposition testimony, the body camera footage of Lt. del Plaine and the criminal convictions resulting from this incident. Dkt. No. 28.

18

a. The Defendant's Deposition Testimony (Dkt. No. 29-1)

The defendant testified that when he entered through the Pub's west door, he immediately pivoted toward the north to visually scan the parts of the Pub that he could not see from outside the doorway. Dkt. No. 29-1 at 32, Tr. p. 122, lines 1-21. The defendant stated that as he turned north, he could see and smell gun smoke, which the defendant found consistent with what the fleeing people had told him. Id. at 48, Tr. p. 186, lines 16-23. The defendant asserted that, upon turning north, he immediately saw Nellum coming toward him. Id. at 32, Tr. p. 124, lines 22-25, Tr. p. 125, lines 1-4. The defendant testified that Nellum had a handgun in his left hand, at around waist height, pointed toward the defendant and the other people standing near the Pub's west door. Id. at 33, Tr. p. 128, lines 14-24. The defendant did not observe anyone other than Nellum with a weapon. Id. at 48, Tr. p. 187, lines 3-15.

Based on the position of Nellum's handgun and his movement toward the west door, the defendant identified Nellum as an immediate threat to the defendant and to the other people inside the bar. Id. at 33, Tr. p. 129, lines 4-18. The defendant determined that he needed to stop the threat Nellum posed, so he aimed his firearm at Nellum. Id. at 33, Tr. p. 128, lines 14-25, Tr. p. 129, lines 1-10. The defendant fired toward Nellum four times. Id. at 36, Tr. p. 141, lines 23-25; 37, Tr. p. 143, lines 16-19. As the defendant fired, a woman wearing white—who was fleeing out the west door—pushed the defendant out the west door. Id. at 37, Tr. p. 143, lines 20-25, Tr. p. 144, lines 1-12. The woman pushing the defendant caused the defendant's firearm to move off

19

target, which led to bullets striking the bar area just east of Nellum's position. Id. at 37, Tr. p. 143, lines 20-25, Tr. p. 144, lines 1-3. The defendant believed that one of his bullets struck Nellum in the upper arm. Id. at 43, Tr. p. 168, lines 16-24.

As the woman in white pushed the defendant out the door, the defendant saw Nellum continuing to advance toward the west door. Id. at 43, Tr. p. 168, lines 7-11. After the woman pushed the defendant out, the defendant took cover behind a car parked just outside the west door. Id. at 34, Tr. p. 130, lines 3-22. Once behind the car, the defendant turned toward the west door, which remained open; the defendant could see into the bar through the doorway. Id. at 35, Tr. p. 134, lines 8-23. The defendant observed Nellum appear in the west doorway. Id., lines 24-25,Tr. p. 135, lines 1-2. The defendant did not see a gun in Nellum's hand but observed a red substance, which appeared to be from a gunshot wound, coming from Nellum's upper left arm. Id., lines 4-10. The defendant began to give Nellum commands for an arrest procedure. Id. Nellum did not appear to respond to the defendant's commands; the defendant then saw Nellum slowly collapse in the doorway. Id., lines 11-14. Nellum laid in the doorway for a short time before the defendant observed someone inside the bar force the west door closed. Id., lines 14-20. Nellum remained inside the Pub after the west door was closed. Id., lines 20-25.

The defendant remained behind the car and did not reenter the Pub that night. Id. at 35, Tr. p. 136, lines 1-7; 48, Tr. p. 188, lines 23-25. Shortly after the west door closed, the defendant called for an ambulance for Nellum. Id. at

48, Tr. p. 189, lines 1-4. When the defendant called for the ambulance, he did not know that there was a second person, later identified as Mr. Sanders, who had been shot in the bar. Id., lines 10-13. As the defendant called for the ambulance, other Appleton police officers—including Lt. del Plaine—began arriving at the scene. Id. at 35, Tr. p. 136, lines 3-7. The defendant relayed to the arriving officers that Nellum was just inside the west door and that he believed Nellum's gun was still inside the Pub. Id. at 46, Tr. p. 178, lines 16-25. Lt. del Plaine took control of the scene and told the defendant to take a break. Id., lines 23-25; Dkt. No. 29-7 at 1:26-1:46.

A few hours after the incident, the defendant was told that one of his gunshots had hit someone other than Nellum. Id. at 48, Tr. p. 189, lines 5-9. The defendant later learned that that person was Mr. Sanders. Id., lines 14-20. The defendant testified that he never saw Mr. Sanders during the incident and that he did not intend to shoot Mr. Sanders. Id. at 46, Tr. p. 180, lines 15-20; 48, Tr. p. 189, lines 21-22.

>            b.      Donna Skogeboe's Deposition Testimony
>                    (Dkt. No. 32-2)

Skogeboe was at the Pub the night of the incident. Dkt. No. 32-2 at 5, Tr. p. 11, lines 19-22. She was inside the Pub, on the south side of the bar area, when she saw Nellum start a fight with Moffitt. Id. at 8, Tr. p. 25, lines 10-16; 12, Tr. p. 39, lines 21-24; Dkt. No. 29-4. Skogeboe heard arguing between Nellum and Moffitt, then observed the argument develop into a tussle in the northwest corner of the Pub. Dkt. No. 32-2 at 7, Tr. p. 18, lines 15-21; 10, Tr. p. 33, lines 2-14; Dkt. No. 29-4. Skogeboe observed Nellum and Moffitt fall to

21

the ground, where they continued to fight. Dkt. No. 32-2 at 12, Tr. p. 40, lines 3-5.

Skogeboe expected the fight to be remedied quickly because the bartender went from behind the bar to break it up. Id. at 7, Tr. p. 18, lines 21-25, Tr. p. 19, line 1. But then Skogeboe heard a "pop." Id., Tr. p. 19, lines 4-5. Skogeboe testified that Nellum had pulled out a gun and shot at Moffitt. Dkt. Id. at 12, Tr. p. 39, line 25, Tr. p. 40, lines 1-2. Skogeboe observed Mr. Sanders and at least one other person trying to get the gun away from Nellum. Id. at 7, Tr. p. 19, lines 15-23. Skogeboe dropped to the ground because she was afraid of getting shot. Id. Tr. p. 19, line 25, Tr. p. 20, lines 1-6. Skogeboe decided she was going to leave the Pub by the west door. Id. at 19, Tr. p. 68, lines 6-8.

Before Skogeboe could leave through the west door, she observed Nellum escape the tussle with his gun and move toward the west door. Id. at 12, Tr. p. 40, lines 6-11. Skogeboe observed Nellum running toward the west door with the gun in his left hand, down near his waist; she did not see Nellum point the gun at anyone while he was moving to the west door. Id., lines 16-20; 18, Tr. p. 63, line 25, Tr. p. 64, lines 1-6. Skogeboe acknowledged that because Nellum was swinging his arms as he ran toward the west door, the gun could have been pointing toward the door at times. Id. at 20, Tr. p. 73, lines 2-14. Skogeboe testified that even though Nellum never pointed the gun directly at her, she was afraid and felt that she was in danger. Id. at 18, Tr. p. 64, lines 7-24.

22

When Skogeboe observed Nellum move toward the west door, she backed away from that door and got down again. Id. at 19, Tr. p. 68, lines 2-11. Skogeboe saw Nellum still holding the gun moments before the defendant entered the Pub. Id. at 13, Tr. p. 42, lines 2-8. Skogeboe did not see the defendant enter the Pub or discharge his firearm because she had her hands over her head, but she did hear additional gunshots. Id. at 7, Tr. p. 21, lines 3-11. After the additional shots, Skogeboe looked toward the west door and saw Nellum on the ground near that door. Id. at 19, Tr. p. 68, lines 12-15. Skogeboe decided to get up and move toward the west door, at which time she observed Dree Sullivan (Nellum's girlfriend) take the gun from Nellum before Sullivan left through the west door. Id. at 9, Tr. p. 27, lines 1-10; 19, Tr. p. 68, lines 1-25, Tr. p. 69, lines 1-9.

After Sullivan left with the gun, Skogeboe closed the west door to prevent Sullivan or anyone else from coming back in the bar. Dkt. No. 32-2 at 15, Tr. p. 50, lines 8-13. Skogeboe then aided Nellum, who she noticed was bleeding from his arm. Id. at 8, Tr. p. 22, lines 9-14; 15, Tr. p. 50, lines 14-15. Skogeboe testified that Nellum now had a hole in his arm, which was not there when she saw him running toward the west door. Id. at 21, Tr. p. 77, lines 2-5. Skogeboe helped Nellum take off his shirt, so she could use it to tie up his arm. Id. at 14, Tr. p. 49, lines 2-7. Once Skogeboe had tied up Nellum's arm, she started moving toward the north (front, College Avenue) door to lock it. Id. at 8, Tr. p. 22, lines 13-17.

While heading from the west door to the north door, Skogeboe found Mr. Sanders laying on the floor. Id., lines 17-19. Skogeboe observed Mr. Sanders lying on his back with his feet pointing toward the north door. Id. at 9, Tr. p. 28, lines 6-25, Tr. p. 29, lines 1-10. Skogeboe testified that it seemed like Mr. Sanders was heading to the north door when he fell backwards. Id. Skogeboe tried to aid Mr. Sanders but could not figure out how to help him. Id. at 8, Tr. p. 22, lines 20-25, Tr. p. 23, lines 1-3.

        c.      Lt. del Plaine's Body Camera Footage (Dkt. No. 29-7)

As the court has discussed, the defendant provided del Plaine's body camera footage. Dkt. No. 29-7. When del Plaine first arrived and was talking with the defendant, the defendant shined his flashlight into the State Street doorway where Nellum had gone to the floor and said, "he's right there, though"; del Plaine responded "I see that." Id. at 1:33-1:37. Lt. del Plaine then asked the defendant if "he" was down, to which the defendant replied "he is hit, I know he is hit." Id. at 1:49-1:56. del Plaine then stated "okay, I see the guy here." Id. at 2:00-2:07. Lt. del Plaine took control of the scene and told the defendant to take a break. Id. at 1:26-1:46. Although not mentioned in the defendant's proposed findings of fact, Lt. del Plaine's body camera footage also shows del Plaine and other officers entering the Pub and discovering Mr. Sanders, who is experiencing a medical emergency. Dkt. No. 29-7 at 2:40-3:27, 6:45-10:15. The officers do not mention observing a firearm anywhere near Mr. Sanders as they are rendering him aid. Id. at 6:45-10:15.

### d. The Resulting Convictions

The defendant submitted records for two criminal cases that resulted from the shooting at the Pub. Dkt. No. 29 at 132-170. The records from State of Wisconsin v. Dree F. Sullivan, Outagamie County Case No. 2107CF420, show that on February 6, 2018, Sullivan pled guilty to Harboring/Aiding a Felon-Falsify Information for taking Nellum's gun from him on May 21, 2017 and hiding it from the police. Dkt. No. 29-9 at 1. The records from State of Wisconsin v. Henry M. Nellum, Outagamie County Case No. 2017CF411, show that on January 16, 2020, Nellum pled guilty to the following charges stemming from the incident: First Degree Recklessly Endangering Safety, Felony Murder-Battery, Use of Dangerous Weapon, Possession of a Firearm-Convicted of a Felony, Operating a Firearm While Intoxicated and Carrying a Concealed Weapon. Dkt. No. 29-8 at 1-2.

### 2. *The Plaintiff's Version*

The plaintiff's version of events primarily relies on Moffitt's deposition and declaration, with some references to Skogeboe's deposition.[3] Dkt. No. 34.

---

[3] The plaintiff's proposed findings of fact also reference deposition testimony from del Plaine and Sgt. Matthew Ollwerther. Dkt. No. 34 at 3-5. The plaintiff cites to these depositions in support of his assertion that Mr. Sanders was wearing all black, and to describe the officers' treatment of Mr. Sanders as they secured the Pub. Id. As the court has explained, the video footage shows that Nellum also was wearing black that night. As for the officers' treatment of Mr. Sanders when they secured the Pub, it is not relevant to the plaintiff's sole claim: that the defendant used unreasonable force in shooting Mr. Sanders. For that claim, the court must focus on the perspective of a reasonable officer in the same circumstances as the defendant. Horton v. Pobjecky, 883 F.3d 941, 949 (7th Cir. 2018) ("A plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of the circumstances."). This means that the court may

a. Leander Moffitt's Declaration (Dkt. No. 33)

The plaintiff submitted a March 18, 2021 declaration signed by Moffitt. Dkt. No. 33. Moffitt averred that Nellum started the fight at the Pub, and that Nellum pulled a gun during the fight. Id. at ¶2. He averred that he grabbed Nellum's hand, arm and the gun, and that the two men fell to the ground and continued to fight. Id. Moffitt averred that Nellum then got up off the ground, and that "[a]nother man" grabbed Nellum around his arms and that the gun fell to the ground. Id. at ¶3. Moffitt then averred that "Jimmie Sanders walked over and picked up the gun." Id. He averred that as he got up, he heard three shots and saw Mr. Sanders fall to the ground. Id. at ¶4. Moffitt averred that he and Mr. Sanders were facing each other when Mr. Sanders fell, and that he—Moffitt—was about eight feet away from Mr. Sanders at the time, so close that Mr. Sanders's blood was spattered on his clothes. Id. Moffitt averred that Mr. Sanders was not pointing the gun at anyone when the defendant shot him. Id. The declaration concluded:

> Henry Nellum was not holding a gun or pointing it [sic] anyone when Jimmie Sanders was shot. After I was arrested, [the defendant] told me that he shot at Henry Nellum because Henry Nellum was pointing a gun at me. I told [the defendant] that Henry Nellum did

---

consider only the circumstances leading up to and surrounding the defendant's use of force. Id. at 950 (noting that the court "must refuse to view the events through hindsight's distorting lens" and that the court "must consider the totality of the circumstances, including the pressures of time and duress, and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances"). The court understands that del Plaine's body camera footage arguably shows that the officers were treating Mr. Sanders more like a suspect than an innocent victim, which must be extremely painful for his loved ones. But that treatment sheds no light on whether the defendant used excessive force against Mr. Sanders.

26

not have a gun when [the defendant] started shooting, which was true.

Id. at ¶5.

        b.     Leander Moffitt's Deposition Testimony (Dkt. No. 32-1)

Two months later, on May 20, 2021, Moffitt sat for his deposition. Dkt. No. 32-1. Moffitt testified that while he was at the Pub on May 21, 2017, Nellum started arguing with him. Id. at 6, Tr. p. 20, lines 2-21. This argument escalated into a fistfight, in which both men ended up on the ground in the northwest corner of the Pub. Id. at 7, Tr. p. 23, lines 15-25, Tr. p. 24, lines 1-14; 17, Tr. p. 64, lines 15-21. While on the ground, Nellum got on top of Moffitt. Id. at 17, Tr. p. 64 lines 22-24. Nellum stood up, while Moffitt remained on the ground because he had injured his shoulder. Id. at 9, Tr. p. 30, line 16; Tr. p. 31, lines 7-11. Mr. Sanders and another patron intervened and moved Nellum away from Moffitt. Id. at 13, Tr. p. 46, lines 24-25, Tr. p. 47, lines 1-7. At some point during this scuffle, Nellum pulled out a gun and fired at Moffitt. Id. at 6, Tr. p. 20, lines 22-25, Tr. p. 21, lines 1-7; 13, Tr. p. 46, lines 9-12.

At his deposition, Moffitt testified that after Nellum fired his gun, Mr. Sanders and Nellum began to fight for possession of the gun. Id. at 9, Tr. p. 30, lines 12-25, Tr. p. 31, lines 1-15. While Mr. Sanders and Nellum were scuffling for the gun, the gun went off and Nellum was shot in the arm. Id. Eventually Nellum's gun fell to the ground and Mr. Sanders picked it up. Id. at 6, Tr. p. 20, lines 24-25, Tr. p. 21, line 1.

Moffitt testified that Mr. Sanders was holding Nellum's gun when the defendant fired into the Pub. Id. at 6, Tr. p. 20, lines 24-25, Tr. p. 21, lines 1-

27

11. Moffitt did not hear the defendant identify himself as police or give any commands before shooting. Id. at 16, Tr. p. 61, lines 14-16; 19, Tr. p. 71, lines 3-5. Moffitt testified that when the defendant fired into the Pub, Mr. Sanders was facing Moffitt, with his back toward the west door. Id. at 7, Tr. p. 22, lines 7-25. He testified that Mr. Sanders was not pointing the gun at anyone when the defendant shot him in the back. Id. at 14, Tr. p. 50, lines 12-25, Tr. p. 51, line 1; 18, Tr. p. 66, lines 17-21. According to the plaintiff's proposed findings of fact, Moffitt testified that the defendant told Moffitt that the defendant shot Mr. Sanders because the defendant feared that Mr. Sanders would shoot Moffitt.[4] Dkt. No. 34 at ¶15.

   c. Donna Skogeboe's Deposition Testimony
     (Dkt. No. 32-2)

   The plaintiff asserts that Skogeboe's deposition testimony is inconsistent regarding Nellum's movements when the defendant fired into the Pub. Dkt. No.

---

[4] The plaintiff's proposed findings of fact include the following proposed fact: "[The defendant] told Mr. Moffitt that [the defendant] shot Mr. Sanders because Mr. Sanders was going to shoot Mr. Moffitt in the back." Dkt. No. 34 at 3. As the source of this proposed fact, the plaintiff cites two portions of Moffitt's deposition and part of his declaration. Id. But the cited portions of Moffitt's deposition do not specify that *Mr. Sanders* was the person at whom the defendant told Moffitt he was shooting. Dkt. No. 32-1 at 11, Tr. p. 40, lines 3-9; Id. at 14, Tr. p. 51, lines 7-10. Rather, these portions include statements from Moffitt such as ". . . [the defendant] came out and told me that he shot *the guy* because he was going to shoot me in the back," id. at 11, Tr. p. 40, lines 7-9 (emphasis added), and ". . . [the defendant] say *the man* was going to shoot me in the back and he done his job," id. at 14, Tr. p. 51, lines 8-9 (emphasis added). Moffitt's declaration states the following: "After I was arrested, [the defendant] told me that he shot at *Henry Nellum* because *Henry Nellum* was pointing a gun at me." Dkt. No. 33 at ¶5 (emphasis added). This statement from Moffitt's declaration contradicts, rather than supports, the plaintiff's proposed finding of fact.

35 at ¶57. The plaintiff points to portions of Skogeboe's deposition where she agreed that when the defendant fired into the Pub, Nellum was not moving toward the defendant, Nellum was standing still and Nellum's gun was not swinging. Dkt. No. 32-2 at 23, Tr. p. 82, lines 21-25, Tr. p. 83, lines 1-16. The plaintiff also emphasizes that Skogeboe did not hear the defendant identify himself as police or give any commands before shooting into the Pub. Id. at 14, Tr. p. 47, lines 1-6.

## III.   The Parties' Arguments

The defendant seeks summary judgment on three grounds: (1) the Fourth Amendment is not implicated because Mr. Sanders was not the intended target of the defendant's use of force; (2) the defendant's use of force was reasonable under the circumstances; and (3) the defendant is entitled to qualified immunity. Dkt. No. 27 at 5-12.

### A.   The Defendant's Brief in Support of Summary Judgment (Dkt. No. 27)

The defendant asserts that a "Fourth Amendment seizure occurs only when there is a 'governmental termination of freedom of movement through means intentionally applied.'" Dkt No. 27 at 5 (quoting Brower v. County of Inyo, 489 U.S. 593, 596–97 (1989)). He contends this means that where a police officer fires his gun at a fleeing suspect and the bullet inadvertently strikes an innocent bystander, there has been no Fourth Amendment seizure. Id. at 6. He argues that Mr. Sanders was an innocent bystander and that any attempt by the plaintiff to create a factual dispute regarding whether Nellum had a gun or the reasonableness of the force is of no consequence, because

29

there is no dispute that Mr. Sanders was not the intended target of the defendant's bullets. Id. at 7. The defendant says that because Nellum was the sole intended target of the defendant's bullets, Mr. Sanders's Fourth Amendment rights were not implicated. Id.

The defendant argues that even if the plaintiff could state a Fourth Amendment claim for the defendant's use of force directed at Nellum, the defendant's use of force was reasonable under the circumstances. Id. at 7-10. The defendant asserts that he responded to an active shooter situation inside the Pub, then observed Nellum running toward him with a gun pointed in his direction. Id. at 9. The defendant claims that "[t]his short-duration, high-stress episode necessitated quick decisions from [the defendant] in extremely dangerous and uncertain circumstances." Id. The defendant maintains that "[t]he law is clear that an officer can use deadly force when a suspect is threatening the lives of an officer or others with a deadly weapon or where there is probable cause to believe he has committed a crime involving the infliction or threatened infliction of serious physical harm." Id. at 9-10. The defendant argues that his use of force was reasonable. Id. at 7-10.

The defendant also asserts the affirmative defense of qualified immunity and asserts that "Mr. Sanders being unintentionally shot while [the defendant] was responding to the threat posed by Mr. Nellum does not bar [the defendant's] entitlement to qualified immunity." Id. at 12. The defendant claims that the "[p]laintiff cannot cite to any case that clearly established in May of 2017, that [the defendant's] split-second decision to use lethal force on Mr.

30

Nellum who was suspected of firing a gun at Pub patrons and who was seen running toward [the defendant] and other patrons with a gun was a clear violation of Mr. Sander's constitutional rights." Id. The defendant avers that "[t]o the contrary, the well-established law demonstrates that law enforcement officers can reasonably exercise the use of deadly force if another officer, or those in the immediate vicinity are in imminent danger of death or serious bodily injury." Id. (citing Siler v. City of Kenosha, 957 F.3d 751 (7th Cir. 2020)).

B.    The Plaintiff's Opposition Brief (Dkt. No. 36)

The plaintiff disputes several facts upon which the defendant bases his Fourth Amendment argument. Dkt. No. 36 at 4-5. It cites Estate of Davis v. Ortiz, 987 F.3d 635 (7th Cir. 2021), which the plaintiff describes as a case where "a sheriff's deputy fired four shots into a car the deputy claimed was driving at him" and the "Seventh Circuit rejected the deputy's argument that he was only trying to shoot the driver." Id. at 4. The plaintiff cites Ortiz in arguing that a court cannot determine whether an officer's use of force was reasonable when factual disputes remain. Id. (citing Ortiz, 987 F.3d at 640-41).

The plaintiff compares the current case to Ortiz, asserting that both have lingering factual disputes. Id. at 5. The plaintiff disputes that "Mr. Nellum was pointing a gun at [the defendant] when he started shooting" and that "Mr. Nellum was moving towards [the defendant] when he started shooting," and he maintains that "[the defendant's] description of the person he intended to shoot at matches only Mr. Sanders." Id. The plaintiff also "submits that shooting into a crowded bar without a description of a suspect, without hearing or seeing

31

any violation of law, and without announcing yourself or giving any commands is objectively unreasonable under the Fourth Amendment." Id. (citing Nelson v. City of Davis, 685 F.3d 867, 877 (9th Cir. 2012); Lytle v. Bexar County, 560, F.3d 404, 417 (5th Cir. 2009); Boyd v. Benton County, 374 F.3d 773, 779 (9th Cir. 2004)).

The plaintiff argues that the defendant is not entitled to qualified immunity because "[a]t the time of [sic] the incidents at issue here occurred, Supreme Court precedent provided clear notice that 'the reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" Id. at 8 (quoting Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cnty., 542 U.S. 177, 187 (2004)). The plaintiff asserts that "[f]ollowing the Supreme Court's lead, the Seventh Circuit considers both binding circuit precedent and decisions from other circuits in determining whether the law is clearly established." Id. (citing Werner v. Wall, 836 F.3d 751, 762 (7th Cir. 2016)). The plaintiff appears to contend that officers are not entitled to qualified immunity when "the illegality of the Police Official['s] conduct is sufficiently clear that [he] can fairly be said to have been on notice of the impropriety of [his] actions." Id. at 8-9 (quoting Kinney v. Weaver, 367 F.3d 337, 372 (5th Cir. 2004) (en banc)). In response to the defendant's argument that the "[p]laintiff cannot cite to any case that clearly established" the defendant acted unlawfully, the plaintiff states that "[the defendant] has not established that [sic] the absence of a disputed fact about whether Mr.

32

Nellum was suspected of firing a gun at Jack's Apple Pub or whether Mr. Nellum was running towards [the defendant] or others." Id. at 9.

C.     The Defendant's Reply Brief (Dkt. No. 37)

The defendant begins his reply by stating that the "[p]laintiff's bold attempt to assert that Mr. Nellum was shot in the arm by his own gun, which Mr. Sanders had in his hand when [the defendant] entered the bar, is astonishing and would implicate a basis for [the defendant] to have directed force at Mr. Sanders." Dkt. No. 37 at 1. But the defendant says that "this is not what the undisputed evidence shows." Id. The defendant argues that the plaintiff has not raised a genuine dispute of material fact and that the court should not accept the plaintiff's version of the facts. Id. at 2-3. The defendant asserts that the plaintiff relies only on the deposition testimony of Skogeboe to establish a factual dispute and that the submitted video footage refutes the plaintiff's version of facts.[5] Id. at 3. The defendant also contends that the plaintiff failed to address the defendant's Fourth Amendment arguments, and thus has waived its Fourth Amendment claims. Id. at 3-4.

The defendant argues that "[e]ven if the Court were to accept Plaintiff's facts as true, there would still be no Fourth Amendment violation." Id. at 5. He says that

[u]nder Plaintiff's proposed facts, [the defendant] would have been entitled to use deadly force based on Mr. Sanders suggested shooting

---

[5] As the court has explained, the plaintiff principally relies on the testimony of Moffitt, not Skogeboe; and the video footage is not "so definitive that there could be no reasonable disagreement about what the video depicts," Kailin, 77 F.4th at 481, other than in relation to whether anyone in the Pub besides Mr. Sanders was wearing all black.

33

of Mr. Nellum and because he was holding a deadly weapon in his hands seconds after shots were fired in the bar. Plaintiff's placement of Mr. Nellum's gun in Mr. Sanders [sic] does not indicate that [the defendant's] use of force was unreasonable.

Id. at 6. The defendant distinguishes the current case from Ortiz and the other cases cited by the plaintiff, asserting that "[t]here is no factual dispute as to who or what [the defendant's] shots were intended for." Id. at 7. The defendant reiterates that because Mr. Sanders was not the defendant's intended target, Mr. Sanders's Fourth Amendment rights were not implicated. Id. at 7-8.

Finally, the defendant argues that the plaintiff has failed to show the elements necessary to defeat a qualified immunity defense. Id. at 8-10. The defendant contends that "Plaintiff's Response does not identify any case law supporting that an officer could not use deadly force on a gunman during an active shooter situation, or any case holding an officer liable under the Fourth Amendment when he did not intend to seize the Plaintiff." Id. at 9. The defendant concedes that "Plaintiff correctly states that the Seventh Circuit considers both binding circuit precedent and decisions from other circuits in determining whether the law is clearly established," but maintains that "Plaintiff misapplies the concept by arguing this Court should apply Fifth Circuit qualified immunity jurisprudence rather than citing to a Fifth Circuit case with closely analogous facts." Id. In closing, the defendant argues that "[the defendant] is entitled to qualified immunity because Plaintiff could not identify any case that would have clearly placed [the defendant] on notice that he could [sic] utilize deadly force against an active shooter." Id.

**IV.    Analysis**

To prevail on a §1983 claim, the plaintiff must present evidence that (1) Mr. Sanders was deprived of a right secured by the Constitution or laws of the United States; and (2) the person who deprived him of that right was acting under color of state law. Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citation omitted). "Section 1983 is not itself a source of any substantive rights, but instead provides the means by which rights conferred elsewhere may be enforced." Bublitz v. Cottey, 327 F.3d 485, 488 (7th Cir. 2003). An unreasonable seizure, in violation of the Fourth Amendment, may allow for liability under §1983. See Brower, 489 U.S. at 599 (stating that a "'[s]eizure' alone is not enough for §1983 liability; the seizure must be 'unreasonable'").

    A.    Intended Target of Use of Force

        1.    *Legal Standard*

The Fourth Amendment protects people from unreasonable seizures. U.S. CONST. amend. IV. "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied[.]" Brendlin v. California, 551 U.S. 249, 254 (2007) (citations and internal quotation marks omitted). "While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the

35

Fourth Amendment." <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985) (citation omitted).

"A seizure occurs even when an *unintended person or thing* is the object of the detention or taking, but the detention or taking itself *must be willful*." <u>Brower</u>, 489 U.S. at 596 (citations omitted) (emphasis added). In <u>Brower</u>, the Supreme Court explained this concept by distinguishing two hypothetical scenarios. <u>Id.</u> In the first scenario, a parked and unoccupied police car slips its brake and "by lucky chance" pins against a wall a serial murderer who has outstanding arrest warrants. <u>Id.</u> In the second scenario, a police car pulls alongside a fleeing car, sideswipes it and causes a crash. <u>Id.</u> at 597. The Supreme Court explained that the first scenario was not a seizure, despite the "governmentally desired termination" of the serial murderer's movement, because it was not the result of a willful act, such as an officer choosing to ram his car into a suspect's vehicle. <u>Id.</u> at 596-97. The <u>Brower</u> court summarized this distinction by saying "that a Fourth Amendment seizure [occurs] . . . only when there is a governmental termination of freedom of movement *through means intentionally applied*." <u>Id.</u> (emphasis in original).

The Seventh Circuit applied <u>Brower</u>'s "through means intentionally applied" standard in <u>Bublitz</u>, 327 F.3d at 488-89. In <u>Bublitz</u>, officers engaged in a high-speed chase of a suspect who had robbed a McDonald's restaurant. 327 F.3d at 486-87. After a prolonged chase and several failed attempts to stop the suspect's vehicle, one officer deployed a spike strip approximately ten seconds before the suspect reached him. <u>Id.</u> at 487. After the suspect ran over

36

the spike strip, "his car veered across the highway, colliding with the minivan in which the Bublitz family was riding," resulting in the death of two members of the Bublitz family and severe injuries to another. Id. at 486-87. In rejecting Bublitz's Fourth Amendment claim against the officers, the Seventh Circuit determined that the officers "did not intentionally apply *any* means in an attempt to terminate the freedom of movement of the Bublitz family—the unfortunate collision between [the suspect] and the Bublitzes was not a means intended by police to stop the family, but rather an unintended consequence of an attempt to seize [the suspect]." Id. at 489 (emphasis in original). The court reasoned that the officers' intentional act to stop the suspect did not demonstrate that the officers "intended to stop any other car that could potentially become involved in a subsequent collision." Id.

The Seventh Circuit later distinguished the facts in Bublitz from the facts in Duran v. Sirgedas, where officers used pepper spray on a large group having a party in a family home and the partygoers then sued for unreasonable use of force under the Fourth Amendment. 240 F. App'x 104, 106-07 (7th Cir. 2007). In Duran, the officers argued that when they deployed pepper spray into the house, they had not seized any partygoer because they did not target any specific partygoer. Id. at 112. In rejecting this argument, the Seventh Circuit stated that "if a police officer intends to inflict injury, without justification, the fact that the officer intentionally targets a large group of individuals, as opposed to a specific individual, is irrelevant." Id. In comparing the facts of Duran to those of Bublitz, the Seventh Circuit stated that Duran "differs from

37

the situation where an innocent bystander is unintentionally injured as a result of an officer's alleged excessive force" because in Duran, "all of the individuals in the house claim they were targeted." Id. at 113 n.5.

The Supreme Court subsequently further clarified the Brower "through means intentionally applied" standard in Brendlin, 551 U.S. 249, 254, 260-61, and in Torres v. Madrid, 592 U.S. 306, 316-318, 321-325 (2021). In Brendlin, the Supreme Court reiterated that "an 'unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" Brendlin, 551 U.S. at 254 (quoting Brower, 489 U.S. at 596). In describing the holding in Brower, the Supreme Court stated, "our point was not that Brower alone was the target but that officers detained him 'through means intentionally applied'; if [Brower's] car had had another occupant, it would have made sense to hold that [the other occupant] too had been seized when the car collided with the roadblock." Id. at 261. In Torres, the Supreme Court distinguished between "seizures by *control* and seizures by *force*." 592 U.S. at 322 (emphasis in original). The Court explained that a seizure by force "requires the use of force with *intent to restrain*" and that "[a]ccidental force will not qualify." Id. at 317 (emphasis in original). The Supreme Court held that "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context." Id. (emphasis in original). The Court elaborated that "[w]hile a mere

38

touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain." Id.

### 2. *Analysis*

The parties have a "genuine dispute" regarding who the defendant intended to shoot when he fired into the Pub, but the dispute does not relate to a "material fact" regarding whether a seizure occurred, because the question is not *who* the defendant intended to shoot, but whether he *intended* to shoot someone as opposed to accidentally shooting at someone. See Anderson, 477 U.S. at 248 (stating that "[m]aterial facts" are those that "might affect the outcome of the suit"). The defendant cites Brower for the premise that a seizure occurs only when there is a "governmental termination of freedom of movement through means intentionally applied," but ignores the fact that Brower also stated that "[a] seizure occurs even when an *unintended person or thing* is the object of the detention or taking, but the detention or taking itself *must be willful*." Brower, 489 U.S. at 596–97 (emphasis added). Subsequent Supreme Court rulings have reiterated that an "unintended person" may be the subject of a seizure if the officer willfully or volitionally deployed the mechanism that terminated or restrained that person's freedom of movement. Brendlin, 551 U.S. at 254 (stating "an 'unintended person . . . [may be] the object of the detention,' so long as the detention is 'willful' and not merely the consequence of 'an unknowing act.'" (quoting Brower, 489 U.S. at 596)). The question in an alleged seizure by force is not whether the defendant intended to shoot Mr. Sanders—in other words, not a question of who he intended to shoot—but

rather "whether the challenged conduct *objectively* manifests an intent to restrain"—whether he intended to shoot someone—because the court "*rarely probe[s] the subjective motivations of police officers* in the Fourth Amendment context." <u>Torres</u>, 592 U.S. at 317 (emphasis added).

The defendant cites <u>Bublitz</u> but does not acknowledge the distinctions between the facts in <u>Bublitz</u> and the facts in other Seventh Circuit precedent. Dkt. No. 27 at 6-7. In <u>Bublitz</u>, the plaintiff's van collided *with the suspect's vehicle* after the suspect ran over spike strips then "veered across the highway." <u>Bublitz</u>, 327 F.3d at 486. There was an interceding event—the suspect's vehicle "veer[ing] across the highway"—that distanced the officer's action (laying the spike strip) from the harm to the plaintiff (crashing into the suspect's vehicle). <u>Id.</u>

The existence of an interceding event in <u>Bublitz</u> distinguishes it from other cases where an officer used force against an "unintended person." For example, the plaintiff cites <u>Nelson</u>, 685 F.3d at 877—a Ninth Circuit case—in arguing that "shooting into a crowded bar without a description of a suspect, without hearing or seeing any violation of law, and without announcing yourself or giving any commands is objectively unreasonable under the Fourth Amendment." Dkt. No. 36 at 4-5. In <u>Nelson</u>, the Ninth Circuit allowed a college student to pursue a Fourth Amendment claim against an officer who fired a pepper ball projectile into a crowded party; the pepper ball hit the college student in the eye. <u>Nelson</u>, 685 F.3d at 872. In interpreting <u>Brower</u>, the Ninth Circuit stated, "To constitute a seizure, the governmental conduct must be

purposeful, and cannot be an unintentional act which merely has the effect of restraining the liberty of the plaintiff." Id. at 876. The Ninth Circuit elaborated that "[f]or an act to be unintentional, the governmental conduct must lack the element of volition; an absence of concern regarding the ultimate recipient of the government's use of force does not negate volition." Id.

The Ninth Circuit's reasoning in Nelson does not conflict with the Seventh Circuit's case law, as explained in Christopher v. Ortiz, Case No. 18-CV-1846, 2019 WL 6310559, at *1 (E.D. Wis. Nov. 25, 2019), the district court order that was appealed in Ortiz, 987 F.3d at 638. The parties in this case correctly recount that the parties in Ortiz disputed whether the officer was "shooting at the car *generally* to make it stop, rather than at the driver or any other particular area of the vehicle." Ortiz, 2019 WL 6310559, at *6 (emphasis in original). But the parties neglect to mention that "[i]t [was] undisputed that [the officer] did not intentionally target [the plaintiff,]" who was a passenger in the vehicle. Id. at *4. Judge Stadtmueller compared the facts of Ortiz to those in Bublitz and Duran. Id. at *4-7. He determined that the facts of Ortiz were more like Duran and that the officer "[was] not saved from Fourth Amendment liability simply because he directed his force towards a group of people (and the large object they were in at the time), rather than a person standing alone." Id. at *5.

Under this precedent, the defendant "seized" Mr. Sanders under either party's version of events. As the Supreme Court repeatedly has held, the subjective intent of an officer—the question of who he intended to "seize"—does

41

not play a part in the court's Fourth Amendment analysis. See Torres, 592 U.S. at 317 (as recounted earlier, stating the Court "*rarely probe[s] the subjective motivations of police officers* in the Fourth Amendment context" (emphasis added)); see also Brendlin, 551 U.S. at 260 (recounting that the Supreme Court has "repeatedly rejected attempts to introduce this kind of subjectivity into Fourth Amendment analysis"). The court must determine whether the defendant "willful[ly]" deployed force, Brower, 489 U.S. at 596, in a way that "objectively manifests an intent to restrain" *someone*, Torres, 592 U.S. at 317. Neither party argues that the defendant's gun misfired or that he accidentally pulled the trigger as the woman in white pushed past him, so it is undisputed that the defendant willfully discharged his firearm into the Pub. The level of force the defendant willfully deployed—discharging his firearm more than once—objectively shows an "intent to restrain" someone in the Pub. Torres, 592 U.S. at 317 ("While a mere touch can be enough for a seizure, the amount of force remains pertinent in assessing the objective intent to restrain." (emphasis added)); see also Vardeman v. City of Houston, 55 F.4th 1045, 1052 (5th Cir. 2022) (interpreting Torres to mean that "[t]he Supreme Court has not required a finding that the officer intended to arrest the person, only that an objective person would perceive that at least briefly, there was no freedom to go"); Garner, 471 U.S. at 7 ("While it is not always clear just when minimal police interference becomes a seizure, there can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). An objective person, having been shot by an

officer, "would perceive that at least briefly, there was no freedom to go." The defendant seized Mr. Sanders regardless of whether Mr. Sanders was his intended target.

The next question is whether the defendant's seizure of Mr. Sanders was reasonable under the Fourth Amendment. See Brower, 489 U.S. at 599 (stating that a "'[s]eizure' alone is not enough for §1983 liability; the seizure must be 'unreasonable'").

B.   Reasonableness of Use of Force

1.   *Legal Standard*

An officer's "use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Garner, 471 U.S. at 7; see also Horton, 883 F.3d at 948 ("A police officer's use of deadly force on a suspect is a seizure within the meaning of the Fourth Amendment, so the force must be reasonable to be constitutional."). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of "'the nature and quality of the intrusion on the individual's Fourth Amendment interests'" against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Garner, 471 U.S. at 8)).

The court "analyze[s] excessive force cases under an objective reasonableness standard." Taylor v. City of Milford, 10 F.4th 800, 806 (7th Cir. 2021). "A plaintiff must show the officer's use of force was objectively excessive from the perspective of a reasonable officer on the scene under the totality of

43

the circumstances." <u>Horton</u>, 883 F.3d at 949. Because the test is objective, "[i]t does not matter for purposes of the Fourth Amendment that [an officer] subjectively believed that his life was in danger." <u>Weinmann v. McClone</u>, 787 F.3d 444, 449 (7th Cir. 2015). But "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97. In seeking to understand the perspective of the on-scene officer, the court "must consider: the information known to the officer at the time of the encounter; the duration of the encounter; the level of duress involved; 'and the need to make split-second decisions under intense, dangerous, uncertain, and rapidly changing circumstances.'" <u>Siler</u>, 957 F.3d at 759 (quoting <u>Horton</u>, 883 F.3d at 950); <u>see also</u> <u>Burton v. City of Zion</u>, 901 F.3d 772, 780 (7th Cir. 2018) ("[A] court must consider the amount and quality of the information known to the officer at the time." (internal quotation marks omitted)).

The Seventh Circuit has held that "[d]eadly force may be used if the officer has probable cause to believe that the armed suspect (1) 'poses a threat of serious physical harm, either to the officer or to others,' or (2) 'committed a crime involving the infliction or threatened infliction of serious physical harm' and is about to escape." <u>Muhammed v. City of Chicago</u>, 316 F.3d 680, 683 (7th Cir. 2002) (quoting <u>Garner</u>, 471 U.S. at 11–12); <u>see also</u> <u>Sanzone v. Gray</u>, 884 F.3d 736, 740 (7th Cir. 2018) ("When addressing the use of deadly force, the

44

court considers whether a reasonable officer in the circumstances would have probable cause to believe that the [person] poses an immediate threat to the safety of the officers or others."). "If the suspect threatens the officer with a weapon, deadly force may be used" because "[a]t that point, the risk of serious physical harm to the officer or others has been shown." Sanzone, 884 F.3d at 740 (citations omitted); see also King v. Hendricks Cnty. Comm'rs, 954 F.3d 981, 985 (7th Cir. 2020) (stating that if a person "threatens [an] officer with a weapon, deadly force may be used, because the risk of serious physical harm to the officer has been shown"). But "someone does not pose 'an immediate threat of serious harm' solely because he is armed." Est. of Biegert by Biegert v. Molitor, 968 F.3d 693, 700 (7th Cir. 2020). The Seventh Circuit has established that "[h]aving a weapon is not the same thing as threatening to use a weapon." Id.; see Weinmann, 787 F.3d at 450 (holding that whether an officer's use of deadly force against a suicidal man holding a shotgun was excessive depended on whether the man had actually threatened the officer).

As the Seventh Circuit has held, "[t]he obligation to consider the totality of the circumstances in [excessive-force] cases often makes resort to summary judgment inappropriate." Siler, 957 F.3d at 759; see also Cyrus v. Town of Mukwonago, 624 F.3d 856, 862 (7th Cir. 2010) (stating that "summary judgment is often inappropriate in excessive-force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations," particularly where "the one against whom force was used has died, because the witness most likely to contradict the officer's testimony—the

45

victim—cannot testify"). "Nevertheless, if a careful examination of the papers reveals that the material facts are undisputed, and if a court draws all inferences from those facts in favor of the nonmovant, reasonableness is a pure question of law." Siler, 957 F.3d at 759. "Of course, when material facts are disputed, a jury must resolve those disputes and determine whether the officer acted reasonably." Id.

　　　2.　　*Analysis*

There is a genuine dispute of material fact that prevents the court from determining whether the defendant's use of force was reasonable under the circumstances. The parties have submitted conflicting evidence regarding whether Nellum or Sanders was holding Nellum's gun when the defendant discharged his weapon into the Pub, and whether the person holding Nellum's gun at that time was pointing it toward the defendant or anyone else. In the defendant's version of the facts, Nellum was holding his own gun, was running toward the defendant and was pointing the gun in the defendant's general area when the defendant discharged his firearm. Dkt. No. 28 at ¶¶29-35, 61-62. In the plaintiff's version of the facts, Mr. Sanders was holding Nellum's gun and was not pointing it toward anyone when the defendant discharged his firearm. Dkt. No. 34 at ¶¶8, 10-11.

Who was holding Nellum's gun, and whether that person was pointing the gun at anyone when the defendant discharged his firearm, are material facts because they "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. As stated, the Seventh Circuit has held that "[i]f [a] suspect

46

threatens [an] officer with a weapon, deadly force may be used," Sanzone, 884 F.3d at 740, but "someone does not pose 'an immediate threat of serious harm' solely because he is armed," Biegert, 968 F.3d at 700. Whether a person is pointing a weapon toward an officer or another person is a crucial fact for a court to consider in determining whether a reasonable officer would have probable cause to believe that that the person poses "an immediate threat of serious harm." See Sanzone, 884 F.3d at 740; Weinmann, 787 F.3d at 447-50.

The defendant has presented more comprehensive evidence to support his version of events. But a dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248. "To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor." See Heft, 351 F.3d at 282. The plaintiff has established a genuine dispute by submitting Moffitt's declaration and his deposition testimony. Arguably, Moffitt's deposition testimony contradicts some of the statements in his declaration. But "[i]t is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; [the court] leave those tasks to factfinders." Berry, 618 F.3d at 691.

It is not clear what evidence, if any, corroborates Moffitt's declaration and deposition testimony. But those two pieces of evidence place Nellum's gun in Mr. Sander's hand at the time the defendant fired into the pub. And Moffitt's declaration and testimony state that Nellum was not pointing the gun at

47

anyone when the defendant fired. If a reasonable jury were to believe Moffitt's version of events, it could conclude that although Mr. Sanders was armed when he was shot, he wasn't threatening anyone, see Weinmann, 787 F.3d at 447-50, or it could conclude that the defendant considered Mr. Sanders a suspect and shot him in the back, see Garner, 471 U.S. at 21.

Because there is a genuine dispute of material fact that prevents the court from determining whether the defendant's use of force was reasonable under the circumstances, the court cannot grant the defendant's motion for summary judgment on this ground.

C.    Qualified Immunity

1.    *Legal Standard*

"To strike a balance between addressing constitutional injuries committed by state actors and limiting the costs of section 1983 suits, [the Supreme Court] has held that the common-law doctrine of 'qualified immunity' applies in most cases against executive officials, including the police." Ortiz, 987 F.3d at 638 (citing Harlow v. Fitzgerald, 457 U.S. 800, 816 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743, (2011). Qualified immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law." Mullenix v. Luna, 577 U.S. 7, 8 (2015).

"While qualified immunity is an affirmative defense, once raised, the burden shifts to the plaintiff to defeat it." Leiser v. Kloth, 933 F.3d 696, 701

(7th Cir. 2019). "Once an officer asserts qualified immunity, a plaintiff can proceed with his case only if he can show (1) that the facts, taken in the light most favorable to [him], make out a violation of a constitutional right, and (2) that right was clearly established at the time of the alleged violation." Koh v. Ustich, 933 F.3d 836, 844 (7th Cir. 2019) (quotation omitted). "'If *either* inquiry is answered in the negative, the defendant official' is protected by qualified immunity." Reed v. Palmer, 906 F.3d 540, 546 (7th Cir. 2018) (emphasis in original) (quoting Green v. Newport, 868 F.3d 629, 633 (7th Cir. 2017)); see also Est. of Davis v. Ortiz, 987 F.3d at 639 (stating that if the plaintiff cannot satisfy both qualified immunity prongs then "the motion for summary judgment must be granted"). The court has discretion in deciding which of the two prongs should be addressed first. Pearson v. Callahan, 555 U.S. 223, 236 (2009).

Although the Supreme Court's "caselaw '"do[es] not require a case directly on point"' for a right to be clearly established, "'existing precedent must have placed the statutory or constitutional question beyond debate.'"" White v. Pauly, 580 U.S. 73, 79 (2017) (quoting Mullenix, 577 U.S. at 11). "To determine whether a right is clearly established [the court] look[s] to controlling precedent from both the Supreme Court and this circuit, and if there is no such precedent [the court] cast[s] a wider net and examine[s] all relevant case law to determine whether there was such a clear trend in the case law that we can say with fair assurance that the recognition of the right by a controlling

precedent was merely a question of time." <u>Abbott v. Sangamon County, Ill.</u>, 705 F.3d 706, 731 (7th Cir. 2013) (quotation omitted).

The Supreme Court has instructed lower courts "not to define clearly established law at a high level of generality." <u>Mullenix</u>, 577 U.S. at 12. Instead, "[t]he clearly established right must be defined with specificity," and this principle "is particularly important in excessive force cases." <u>City of Escondido, Cal. v. Emmons</u>, 586 U.S. 38, 42 (2019). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." <u>Kisela v. Hughes</u>, 584 U.S. 100, 104 (2018) (quoting <u>Mullenix</u>, 577 U.S. at 13). "An officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it.'" <u>Id.</u> at 105 (quoting <u>Plumhoff v. Rickard</u>, 572 U.S. 765, 778-79 (2014)).

"[T]here can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." <u>D.C. v. Wesby</u>, 583 U.S. 48, 64 (2018) (citation omitted); <u>see also</u> <u>Kisela</u>, 584 U.S. at 105 (explaining that "the general rules set forth in '<i>Garner</i> and <i>Graham</i> do not by themselves create clearly established law outside an "obvious case."'" (quotation omitted)). "In the absence of controlling or persuasive authority, plaintiffs can demonstrate clearly established law by proving that the defendant's conduct was '<i>so egregious and</i>

50

*unreasonable* that . . . no reasonable [official] could have thought he was acting lawfully.'" Kemp v. Liebel, 877 F.3d 346, 351 (7th Cir. 2017) (quoting Abbott, 705 F.3d at 724) (emphasis added)). "But 'a body of relevant case law' is usually necessary to '"clearly establish" the answer' with respect to probable cause." Wesby, 583 U.S. at 64 (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)).

Again, "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment" and the court must view the evidence "'in the light most favorable to the opposing party.'" Tolan v. Cotton, 572 U.S. 650, 656-57 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)). The Supreme Court has held that "[o]ur qualified-immunity cases illustrate the importance of drawing inferences in favor of the nonmovant, even when . . . a court decides only the clearly-established prong of the standard." Id. at 657. "Accordingly, courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." Id.

### 2. *Analysis*

The defendant asserts that "Mr. Sanders being unintentionally shot while [the defendant] was responding to the threat posed by Mr. Nellum does not bar [the defendant's] entitlement to qualified immunity." Dkt No. 27 at 12. He argues that the "[p]laintiff cannot cite to any case that clearly established in May of 2017, that [the defendant's] split-second decision to use lethal force on Mr. Nellum who was suspected of firing a gun at Pub patrons and who was seen running toward [the defendant] and other patrons with a gun was a clear

51

violation of Mr. Sander's constitutional rights." Id. So the defendant has raised the qualified immunity defense.

The burden then shifts to the plaintiff to "show (1) that the facts, taken in the light most favorable to [him], make out a violation of a constitutional right, and (2) that right was clearly established at the time of the alleged violation." Koh, 933 F.3d at 844. As the court has explained, when considering the facts in the light most favorable to the plaintiff, a reasonable jury could determine the defendant committed a constitutional violation by using unreasonable force. That means that the plaintiff has satisfied the first prong of the qualified immunity inquiry. But the plaintiff has not demonstrated that the defendant violated a clearly established right.

In responding to the qualified immunity defense, the plaintiff made only general statements about the protections provided under the Fourth Amendment. Dkt No. 36 at 7-9. The plaintiff argues that the defendant is not entitled to qualified immunity because "[a]t the time of [sic] the incidents at issue here occurred, Supreme Court precedent provided clear notice that 'the reasonableness of a seizure under the Fourth Amendment is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" Id. at 8 (quoting the Supreme Court's 2004 decision in Hiibel, 542 U.S. at 187).[6] That recitation of

_____

[6] In Hiibel, the Supreme Court addressed a challenge to Nevada's "stop and identify" statute. 542 U.S. at 187-88. The full context for the passage the plaintiff quotes says:

what the Supreme Court has said is true, but it does not identify a clearly established right that the plaintiff alleges the defendant violated. The plaintiff appears to contend that officers are not entitled to qualified immunity when "the illegality of the Police Official['s] conduct is sufficiently clear that [he] can fairly be said to have been on notice of the impropriety of [his] actions." Id. at 8-9 (quoting the Fifth Circuit's decision in Kinney v. Weaver, 367 F.3d at 372).[7] But again, the plaintiff has not described the conduct that allegedly was so clearly illegal that the court should find that the defendant was on notice of the impropriety of his actions. The plaintiff says that qualified immunity is not appropriate because there are "disputed fact[s] about whether Mr. Nellum was suspected of firing a gun at Jack's Apple Pub or whether Mr. Nellum was running towards [the defendant] or others." Id. at 9. But those factual disputes

> The principles of *Terry* permit a State to require a suspect to disclose his name in the course of a *Terry* stop. ***The reasonableness of seizure under the Fourth Amendment is determined "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.***" *Delaware v. Prouse*, 440 U.S. 648, 654 . . . (1979). The Nevada statute satisfies that standard. The request for identity has an immediate relation to the purpose, rationale, and practical demands of a *Terry* stop. The threat of criminal sanction helps ensure that the request for identity does not become a legal nullity.

Id. (bold emphasis added). Hiibel has nothing to do with excessive force.

[7] Kinney v. Weaver also is not an excessive force case, nor is it even a Fourth Amendment case. 367 F.3d 337. In Kinney, the Fifth Circuit addressed claims brought by police academy instructors alleging that various cities, counties and their affiliated chiefs of law enforcement violated the instructors' First and Fourteenth Amendment rights. Id. at 340-41.

do not identify a clearly established right that the defendant allegedly violated under any set of facts.

The plaintiff's references to general Fourth Amendment principles imply that the defendant's conduct was so egregious and unreasonable that "no reasonable [official] could have thought he was acting lawfully," Kemp v. Liebel, 877 F.3d at 351 (quotation omitted). But in an excessive force case, a general appeal to Fourth Amendment principles is not enough to show the violation of a clearly established right.[8] See Kisela, 584 U.S. at 106 (stating that "the general rules set forth in 'Garner and Graham do not by themselves create clearly established law outside "an obvious case."'"). As the Supreme Court has stated, "Use of excessive force is an area of the law 'in which *the result depends very much on the facts of each case*,' and thus police officers are entitled to qualified immunity unless *existing precedent 'squarely governs' the specific facts at issue*." Id. (emphasis added) (quoting Mullenix, 577 U.S. at 13); see also Mullenix, 577 U.S. at 12-13 ("Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that [i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." (quotation omitted)); Wesby, 583 U.S. at 64 ("We have stressed that the 'specificity' of the rule is 'especially important in the Fourth Amendment

---

[8] Arguably, given the Seventh Circuit's admonition that courts must articulate the clearly established right with particularity, a general appeal to Fourth Amendment principles is not enough to show a violation of a clearly established right in any case.

context.'" (quoting Mullenix, 577 U.S. at 12-13; Emmons, 586 U.S. at 42-44 ("Under our cases, the clearly established right must be defined with specificity.")). The plaintiff has not identified any "existing precedent [that] squarely governs the specific facts at issue." Kisela, 584 U.S. at 104.

Instead of citing precedent to demonstrate the violation of a clearly established right under the facts of this case, the plaintiff has argued that there are lingering factual disputes. Dkt No. 36 at 9. But in its ten-page opposition brief, the plaintiff has not established that even if the court were to draw all inferences in the plaintiff's favor, its own version of the facts demonstrates the violation of a clearly established right. Id. at 7-9. The plaintiff did not cite any case involving an officer who—after observing people fleeing in panic from a building and yelling that people are shooting inside—looks into the building, observes someone holding a gun and makes a split-second decision, in a fast-moving situation,[9] to shoot at the person, let alone a case where a court has ruled that such conduct violates the Fourth Amendment as a matter of law. The plaintiff has not identified a case in which a court has held that an officer who shoots into a crowded business violates the Fourth Amendment as a matter of law. It has not identified a case in which a court has held that an officer who responds to a chaotic scene involving multiple, frightened reports of shooting and who fires on the person the officer sees in possession of a gun violates the Fourth Amendment as a matter of law. In the

---

[9] The video of the camera pointed at the State Street door shows that it was seconds between when the defendant appeared in the State Street door and when he fired, then was pushed back out.

absence of such clearly established precedent, the court cannot conclude that the plaintiff has shown that the question of whether defendant's actions violated the Fourth Amendment is "beyond debate." See White, 580 U.S. at 79 (explaining that while "caselaw '[do[es] not require a case directly on point'" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate""'"); Mullenix, 577 U.S. at 8 (stating that qualified immunity is meant to protect "all but the plainly incompetent or those who knowingly violate the law"). It was the *plaintiff's* burden to establish that "the unlawfulness of the [defendant's] conduct was clearly established at the time the officer acted," Ortiz, 987 F.3d at 639, and the plaintiff has not met this burden.

In arguing that the defendant's use of force was unreasonable, the plaintiff asserted that "shooting into a crowded bar without a description of a suspect, without hearing or seeing any violation of law, and without announcing yourself or giving any commands is objectively unreasonable under the Fourth Amendment." Dkt. No. 36 at 5. The court has explained that there is a dispute of material fact as to whether the defendant saw a violation of the law or a threat to himself or others. This argument also sounds like a negligence argument—that it is negligent for an officer to fire a gun into a crowded bar without first identifying himself or providing warnings. But even if the defendant's actions were negligent—and the court is not finding that they were—it long as been the law that "negligence is 'a state of mind inconsistent with the requisite breach of duty necessary to constitute a constitutional

56

deprivation,'" which means that "claims based on particular allegations of negligence must be dismissed." <u>Payne for Hicks v. Churchich</u>, 161 F.3d 1030, 1042 (7th Cir. 1998) (quoting <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1429 (7th Cir. 1996)). The plaintiff has not established that the act of shooting into a crowded place without first identifying himself or issuing warnings violates the Constitution as a matter of law.

Because the plaintiff failed to carry its burden in showing that the defendant violated a clearly established right, the court must grant the defendant's motion for summary judgment. Dkt. No. 26. <u>See</u> <u>Ortiz</u>, 987 F.3d at 638-39 (stating that "[o]nce a government official invokes qualified immunity in a section 1983 suit, the burden shifts to the plaintiff to defeat the defense" and "[i]f the plaintiff cannot do so, the motion for summary judgment must be granted").

## V. Conclusion

As the court stated at the beginning of this order, Mr. Sanders's death was a tragedy, but the court cannot conclude that it happened because the defendant violated a clearly established constitutional right.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 26.

57

The court **ORDERS** that this case is **DISMISSED WITH PREJUDICE**.

The clerk will enter judgment accordingly.

Dated in Milwaukee, Wisconsin this 30th day of September, 2025.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**